# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-98V
UNPUBLISHED

| | |
|---|---|
| LISA EGGER,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: August 29, 2022<br><br>Special Processing Unit (SPU); Entitlement to Compensation; Table Injury; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*William E. Cochran, Jr., Black McLaren Jones Ryland & Griffee, P.C., Memphis, TN , for Petitioner.*

*Colleen Clemons Hartley, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT**[1]

On January 18, 2019, Lisa Egger filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 9, 2017. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons detailed herein, I find Petitioner entitled to compensation.

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.  **Relevant Procedural History**

Two years after the claim's initiation, Respondent filed his Rule 4(c) Report challenging compensation because (among other things) Petitioner could not demonstrate that she had suffered a Table SIRVA within the appropriate timeframe. ECF No. 40 at 7. Respondent further asserted that Petitioner failed to provide sufficient evidence to establish a causation-in-fact shoulder injury. *Id.* at 7-9. To resolve this matter, a schedule was established for a ruling on the record. ECF No. 41.

On March 24, 2021, Petitioner filed her Motion in favor of her claim. ECF No. 45. Specifically, Petitioner asserted that the medical records and affidavits demonstrate that her shoulder pain began within 48 hours of her vaccination, and that her pre-existing thyroiditis had not caused her left shoulder complaints. *Id.* at 11. Respondent maintained the contrary, arguing that the affidavits submitted by Petitioner in support of onset within 48 hours were inconsistent with the medical record and therefore should not be credited. ECF No. 50 at 9-11. Respondent also deemed Petitioner's thyroiditis a condition that likely contributed to her left shoulder complaints. *Id.* at 11.[3] After the filing of a Reply in July 2021 (ECF No. 52), the matter was ripe for resolution.

II.  **Factual Findings and Ruling on Entitlement**

   A.  **Legal Standards**

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v.*

---

[3] The parties also contested whether Petitioner could meet the standards of a causation-in-fact claim, but because I am deciding that the Table claim elements have been met, I do not give these alternative grounds for entitlement further consideration.

*Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F.R. § 100.3(a)(II)(C). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Factual Findings Regarding QAI Criteria for Table SIRVA

After a review of the entire record, including Respondent's Rule 4 Report and the parties' briefs, I find that Petitioner has preponderantly satisfied the QAI requirements for a Table SIRVA. The medical records and affidavits filed in this case are hereby incorporated by reference.

#### 1. Prior Condition

The first QAI requirement for a Table SIRVA is lack of a history revealing problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i).

Respondent does not dispute Petitioner has met the first requirement under the QAI for a Table SIRVA. Additionally, I do not find any evidence that Petitioner suffered a pre-vaccination history of problems that would explain her post-vaccination shoulder symptoms. Accordingly, I find that Petitioner has met this first criterion to establish a Table SIRVA.

### 2. Onset of Pain

A petitioner alleging a SIRVA claim must also show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(II)(C)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

Respondent's primary objection to entitlement in this matter is based on his assertion that Petitioner cannot establish that her shoulder pain began within the appropriate timeframe. ECF No. 50 at 9-10. Respondent questions the credibility of the affidavits submitted by Petitioner and Petitioner's friends and family, which affirm that Petitioner's shoulder pain began within 48 hours of vaccination. *Id.* at 10. Respondent argues that the contemporaneous medical records, which indicate that Petitioner did not report her shoulder pain to any medical professional for almost a month post-vaccination despite several intervening medical appointments, should be given more weight. *Id.* at 11.

After consideration of the complete record,[5] I find that Petitioner has offered preponderant evidence to establish that she more likely than not began experiencing shoulder pain within 48 hours of her October 9, 2017 vaccination. My finding is based on the medical records, affidavits, and briefs filed in this matter. Specifically, I note the following:

- Petitioner received a flu vaccination in her left arm on October 9, 2017. Ex 2 at 3-5.

- The same day as her flu vaccination, October 9, 2017, Petitioner attended her fourteenth physical therapy session for her right hip pain. Ex 12 at 9. Petitioner's ongoing hip complaint was her inability to walk for more than 15 minutes without pain or compensation, which caused her to feel "very frustrated/depressed." *Id.* The physical therapist noted that petitioner was "very emotional today and cried with therapy." *Id.* at 12. Petitioner's hypothyroid issues were also noted and felt to be exacerbating her depression and overall fatigue and delaying treatment progression. *Id.* at 9, 12. Petitioner could not tolerate walking for more than 10 minutes at this visit. *Id.* at 12.

---

[5] For the purpose of brevity, I do not summarize and/or address all records, testimony, or arguments put forward.

- Petitioner attended her fifteenth physical therapy session for her right hip pain on October 11, 2017. Ex. 12 at 7-8. Petitioner's mental state was noted to be improved since her last visit, her overall tolerance for treatment was improved, and she was able to walk with more normalized gait pattern. *Id.* at. 8.

- Petitioner followed-up with her orthopedist, Dr. Bonnarens, on October 17, 2017 for her right hip pain. Ex. 4 at 2. Petitioner reported feeling better about her hip, "like she is starting to [turn a] corner between the therapy, the stretching exercises she has been doing and warm soaks and Epsom salt." *Id.* She demonstrated good gait, range of motion, and strength upon examination of her right hip. *Id.*

- On October 18, 2022, Petitioner emailed her PCP to advise that she had received her flu vaccine. Ex. 7 at 453.

- On October 30, 2017, Petitioner attended her final session of physical therapy for her right hip. Ex. 12 at 3-5. Petitioner had progressed significantly and returned to 95% of prior functioning. *Id.* at 3. She was discharged with a home exercise program. *Id.* at 5.

- On November 7, 2017, Petitioner wrote an email to her PCP regarding her liver function and also reported left shoulder pain that began after her flu shot in early October. Ex. 7 at 468. Petitioner advised that she thought the pain might be from a rotator cuff tear and she was taking Aleve for her pain. *Id.* Her shoulder pain, however, was not nearly bad as her hip pain had been. *Id.* She further advised that she was going to a physical therapy evaluation for her shoulder later that day. *Id.*

- At Petitioner's physical therapy evaluation on November 7, 2017, Petitioner reported left shoulder pain after her flu shot. Ex. 3 at 55. Petitioner reported that the pain had continued since and was now affecting her ability to sleep, get dressed, drive, and reach. *Id.* The physical therapist found no radicular symptoms or vascular deficits. *Id.* at 56-57. The physical therapist found overall symptoms consistent with rotator cuff strain, pain with left shoulder abduction, and pain at the end range of motion. *Id.* at 55, 57. Petitioner's hypothyroidism was also noted. *Id.* at 55.

- At Petitioner's physical therapy appointment on November 29, 2017, the physical therapist noted increased joint involvement, potentially in the initial stages of adhesive capsulitis. Ex. 3 at 75. Increased intervention was

recommended and petitioner's decline in thyroid function was noted as potentially affecting shoulder function and healing potential. *Id.*

- On January 9, 2018, Petitioner presented for a hypothyroidism consultation with endocrinologist Dr. Varghese. Ex. 5 at 13. Petitioner's shoulder pain was not recorded, and examination of Petitioner's musculoskeletal system was normal. *Id.* Records for her follow-up at the endocrinologist on January 18, 2018 also indicated normal musculoskeletal examination. *Id.* at 17.

- Petitioner continued regular physical therapy sessions, completing 15 visits between her initial session on November 7, 2017 and her consultation for shoulder pain with her orthopedist, Dr. Bonnarens, on February 27, 2018. *See* Ex. 3 at 55-125.

- On February 27, 2018, Petitioner presented to her orthopedist, Dr. Bonnarens, who she had previously seen for her right hip pain. Ex. 4 at 5. Petitioner reported that she began experiencing shoulder pain two hours after her flu shot, which since increased and caused decreased range of motion. *Id.* Dr. Bonnarens found scapulothoracic substitution and limited glenohumeral internal and external rotation. *Id.* He felt that she was experiencing "frozen shoulder secondary to the pain and disuse associated with both the flu shot and her Hashimoto's [thyroiditis]." Dr. Bonnarens recommended physical therapy. *Id.*

- Petitioner continued with physical therapy and completed another eleven sessions between February 27, 2018 and her next follow-up with Dr. Bonnarens on April 3, 2018. Ex. 3 at 144.

- On April 3, 2018, Dr. Bonnarens noted that Petitioner's range of motion was "vastly improved" and her frozen shoulder was thought to be resolving. Ex. 4 at 7. He recommended Petitioner continue physical therapy. *Id.*

- On April 18, 2018, Petitioner followed-up with Dr. Varghese about her hypothyroidism. Ex. 5 at 19. As before, Dr. Varghese's record indicated a normal musculoskeletal examination. *Id.* at 20.

- On May 1, 2018, Petitioner returned to Dr. Bonnarens for follow-up of her left shoulder. Ex 4 at 11. Petitioner reported improvement though she still reported pain and was still missing some end range of internal and external rotation. *Id.* Dr. Bonnarens felt that Petitioner's issue involved resulting loss

of motion due to inflammatory capsulitis. *Id.* Continued therapy was recommended. *Id.*

- During her re-evaluation on May 29, 2018 with Dr. Bonnarens, Petitioner reported considerable left shoulder pain and an MRI was ordered. *Id.*

- Following an MRI documenting an interstitial partial tear in the distal supraspinatus tendon, rotator cuff tendinosis, moderate AC joint arthrosis, and subacromial/subdeltoid bursitis, Dr. Bonnarens recommended continued physical therapy and surgical options if there was no significant improvement in a four week. Ex. 4 at 12, 15-17.

- On July 10, 2018, Petitioner returned to Dr. Bonnarens and reported doing much better. Ex 4 at 13. He recommended a home exercise program and return visits as needed. *Id.* Petitioner was discharged from physical therapy on July 31, 2018, after 48 sessions. Ex 3 at 27.

In addition to her medical records, Petitioner filed four affidavits in support of her claim: a personal affidavit, the affidavit of her husband – Richard Egger, the affidavit of her friend – Sherry Davis, and the affidavit of her son – Brandon Egger. Ex. 11, 16, 17, 18. Petitioner explained in her affidavit that she and her husband received the flu shot the same day from the same vaccine administrator. Ex. 10 ¶5. Later the same day, her husband mentioned that his arm was sore from the vaccine, and she noted the same. His pain, however, had dissipated in 24 hours while her pain remained. "My left shoulder pain continued and got worse." *Id.* Petitioner's husband affirmed similarly, "[a]fter about one day my arm pain was gone, but Lisa's pain from the vaccine remained." Ex. 18 ¶7. He affirmed that Petitioner "complained every day that the pain in her left arm from the vaccine was not getting better." Ex. 18 ¶8.

Petitioner further explained why her left shoulder complaint was not documented until November 7, 2017. Petitioner felt that her left shoulder symptoms were similar to a previous *right* rotator cuff injury, and she had recently learned that someone she knew had suffered from a similar post-vaccination pain which resolved after several weeks. Petitioner "assumed and was hopeful that [her] pain would resolve soon" as well. Ex. 10 ¶6.

Petitioner acknowledged that her left shoulder was not documented during her October 17, 2017 appointment with Dr. Bonnarens. Ex. 10 ¶7. But because she "was hopeful that the pain was going to resolve soon," she may not have mentioned her pain to Dr. Bonnarens. *Id.* Petitioner further affirmed that she decided to wait until she

completed physical therapy for her right hip to start therapy for her left shoulder because "it is [] difficult to treat two injuries at the same time with physical therapy." *Id.*

Petitioner's friend, Sherry Davis, loosely corroborated Petitioner's recollection of events. Ms. Davis affirmed that they regularly communicated at least once a week through phone calls or text messages. Ex. 17 ¶3. Though she could not recall specific dates, Ms. Davis remembered that Petitioner informed her "within a week of her flu vaccine" that Petitioner's shoulder was still hurting. "It was my understanding that the pain started the same day as the vaccination and did not go away." Ex. 17 ¶4. Ms. Davis provided that her own daughter experienced a similar event, which is why she has specific recollection of Petitioner's situation. Ex 17 ¶5.

Petitioner's son, Brandon Egger, was living with Petitioner and his father, Petitioner's husband, during the relevant period. Ex. 16 ¶3. He recalled the day that both his parents got flu vaccinations and stated that his mother laid down after dinner that evening because of pain and fatigue, which he affirmed was from the vaccination and arm pain[6]. Ex 16 ¶4. He affirmed that his parents explained that "they both got flu shots earlier that day, that they were both sore from the vaccine, but my mother's pain was worse." Ex. 16 ¶5.

Respondent argues that Petitioner's pain did not likely begin within 48 hours of her flu vaccination because she "first discussed the onset of her left shoulder pain twenty-nine days after vaccination and did not identify a specific onset of left shoulder pain until four months after vaccination." ECF No. 50 at 9. Respondent submits that Petitioner had ample opportunity to report her left shoulder pain at the four intervening medical appointments between October 9, 2017 and November 7, 2017. *Id.* More specifically, Respondent contends that on the day of Petitioner's vaccination, "Petitioner was extremely upset and emotional at that time, and it seems extremely unlikely that if petitioner developed severe shoulder pain later that day, she would [sic] have mentioned it two days later when she returned to PT, or a week later when she saw Dr. Bonnarens." *Id.* at 9-10 (assuming Respondent meant "…she would *not* have mentioned…").

Respondent does accurately note that Petitioner had some initial opportunities to mention arm pain to treaters. However, Petitioner's justification for not doing so - that she waited until her her hip problem was resolved to seek treatment for her left shoulder - is reasonable. When Petitioner received her flu vaccination, her right hip pain was particularly debilitating, preventing her from walking for more than 10-15 minutes without pain. *See* Ex. 12 at 7-12. Her hypothyroidism was exacerbating her mental well-being

---

[6] On the day of her vaccination, Petitioner's hip pain and physical therapy treatment thereof were particularly frustrating and difficult—it is unclear whether her shoulder pain or her hip pain is the reason petitioner was fatigued and needed to lay down after dinner. *See* Ex. 12 at 12.

and physical recovery. *Id.* at 9, 12. Petitioner also later reported to her PCP that her shoulder pain was not as severe as her hip pain. Ex. 7 at 468. Petitioner's hope and belief that her shoulder pain would resolve is also reasonable, and wholly consistent with how many Program petitioners view initial pain in the context of what later proves to be SIRVA. *See* Ex. 10 ¶6.

Further, the absence of complaints of left shoulder pain in the medical records for approximately one month does not prohibit a finding of onset within 48 hours. Respondent highlights Dr. Bonnarens's October 17, 2017 record, which makes no mention of shoulder pain – and yet that record *also* says nothing about hypothyroidism, even though it was then impacting petitioner's hip pain recovery. *See* Ex. 4 at 5. In addition, the absence of documented reports of shoulder pain during appointments specifically for a *different* condition – right hip pain – does not undermine the conclusion that Petitioner likely was experiencing shoulder pain at those treatment events.

The medical record is also consistent about the onset issue once it began to be reported to treaters. After Petitioner sought treatment for her left shoulder, she consistently referenced the vaccination as the triggering event, and specifically reported that it began two hours after vaccination to Dr. Bonnarens. Ex. 3 at 55; Ex. 4 at 5; Ex. 7 at 468. Though contemporaneous records are often deemed worthy of more weight than after-the-fact witness statements, the latter are not without probative value – and the statements offered herein support a finding that Petitioner's pain began within 48 hours of the vaccination. Ex. 18 ¶8; Ex. 17 ¶4.

Accordingly, I find that Petitioner has met this criterion to establish a Table SIRVA.

### 3. Scope of Pain and Limited ROM

Respondent has not contested that Petitioner meets this criterion. In addition, the medical records document pain and limited range of motion only in Petitioner's left shoulder following her flu vaccination. *See, e.g.*, Ex. 3 at 55-57, 75; Ex. 4 at 5, 7, 11. Thus, I find that Petitioner has demonstrated by a preponderance of the evidence that her pain and reduced range of motion were limited to the shoulder in which the flu vaccine was administered.

### 4. Other Condition or Abnormality

The last QAI criteria for a Table SIRVA states that "[n]o other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv).

Respondent argues that "[P]etitioner's medical records reflect another condition or abnormality – namely Hashimoto's thyroiditis – that likely contributed to her left shoulder complaints." ECF No. 50 at 11. However, I decline to find that Petitioner's thyroiditis and/or hypothyroidism explains Petitioner's shoulder injury, though it may have impacted her recovery. *See* Ex. 3 at 75; Ex. 4 at 5; Ex. 12 at 9, 12. Petitioner's physical therapist had previously noted that thyroid issues were exacerbating Petitioner's fatigue and delaying treatment progression – solely for her hip pain. Ex. 12 at 9. The same was noted during her physical therapy treatments for left shoulder pain. Ex. 3 at 75. While Dr. Bonnarens associated Petitioner's left shoulder *disuse* to both the flu shot and her Hashimoto's thyroiditis, he never attributed Petitioner's initial shoulder pain or injury to Hashimoto's. *See* Ex. 4 at 5. Additionally, Petitioner's physical therapist and Dr. Bonnarens never diagnosed petitioner with radiculopathy, neuritis, or any other neuropathy.

Accordingly, I do not find evidence of any other condition or abnormality in the medical records that would explain Petitioner's post-vaccination symptoms. Of course, a separate condition causing slower resolution or complications in recovery does weigh somewhat on damages in this case (and therefore Petitioner's claim for pain and suffering will need to factor this in to some extent).

### C. Other Requirements for Entitlement

In light of the lack of additional objections and my own review of the record, I find that Petitioner has established all the requirements for a Table SIRVA claim. However, even if a petitioner has satisfied the requirements of a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c), i.e. receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). Those elements in this matter are established or undisputed. Petitioner is entitled to compensation in this case.

### III. Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA claim. Petitioner is entitled to compensation. **Thus, this case is now in the damages phase and a damages order will be issued shortly.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master